**Application of Edward S. BLAKE and William C. Hammann.**

**Patent Appeal No. 7555.**

United States Court of Customs and Patent Appeals.

April 7, 1966.

John D. Upham, St. Louis, Mo., for appellants.

Joseph Schimmel, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before RICH, Acting Chief Judge, MARTIN, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

ALMOND, Judge.

This is an appeal from the decision of the Patent Office Board of Appeals affirming the rejection of claims 1, 3–10 and 12–17 in appellants' application, serial No. 766,685, filed October 13, 1958, entitled "Functional Fluid Compositions." Appellants have withdrawn the appeal as to claims 7, 9, 10, and 13–17, leaving claims 1, 3–6, and 12 for our consideration.

---

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

Claim 1 is generic and reads as follows:

1. A meta-linked, unsubstituted poly(m-oxyphenylene)-benzene defined by the structural formula

wherein $n$ is an integer of at least 3, and mixtures of the aforesaid poly(m-oxyphenylene)-benzenes.

Claims 3–6 define species encompassed by claim 1, while claim 12 defines unsubstituted poly(m-oxyphenylene)-benzenes having the structural formula set forth in claim 1 where n is an integer from 3 to 6. Like claim 1, claim 12 also includes mixtures of compounds of the structure set forth in the respective claims.

According to appellants' specification, the claimed compounds are high-temperature functional fluids suitable for use as synthetic lubricants for jet engines, hydraulic fluids for supersonic aircraft and missiles, and coolants for electronic equipment.

The claims stand rejected as being fully met by Diamond, United States patent No. 2,940,929, filed June 26, 1958 and issued June 14, 1960.

Diamond relates to lubricating compositions especially designed for use at elevated temperatures and under oxidizing conditions. The compositions comprise broadly:

\* \* \* a major proportion of polyphenyl ethers and minor proportions sufficient to stabilize said ethers against oxidation at temperatures in excess of about 450°F., said additive material being basic and neutral indium salts of fatty acids, thiafatty acids, and of alkylated benzoic acids \* \* \*.

The polyphenyl ethers may have from 3 to 8 phenyl radicals per molecule. The phenyl radicals may be substituted with either a teritary butyl or alpha-cumyl radical or unsubstituted. Diamond specifically discloses bis(m-phenoxyphenyl) ether and m-bis(m-phenoxyphenoxy) benzene, the compounds of appealed claims 3 and 4, respectively. Diamond also contemplates mixtures of unsubstituted and substituted polyethers. Further discussion of Diamond with regard to mixtures will be undertaken, infra.

In an effort to overcome Diamond, appellants submitted two series of affidavits under Rule 131, one series by Hammann and the other by Blake, the joint applicants in the case at bar. The corresponding affidavits of the joint applicants are substantially identical. The Hammann affidavits of April 16, 1962 and February 4, 1963, and the Blake affidavits of April 17, 1962 and February 7, 1963 were filed prior to the original decision of the Board of Appeals on March 31, 1964.

The affidavits of April 16 and April 17, 1962, accompanied by exhibits I and II, allege that "certain subject matter of the above-identified application was conceived and reduced to practice in this country prior to or under a U. S. Government contract for the 'Development of High Temperature Base Stock for Hydraulic Fluids and Lubricants' prior to June 26, 1958"; that exhibits I and II are copies of portions from Hammann's research notebooks; that exhibits I and II show, respectively, the preparation of bis(m-phenoxyphenyl) ether and m-bis (m-phenoxyphenoxy) benzene; that both compositions "were observed to be colorless fluids at room temperature useful as functional fluids"; and that a progress report completed prior to June 26, 1958 indicated that a major manufacturer of jet engines has a great interest in the all-meta unsubstituted aromatic ethers, wherefore the above compositions were synthesized in an attempt to reduce prospective costs.

The examiner criticized the foregoing affidavits stating that the exhibits "are

not legible and therefore should be accompanied by typewritten copies." In response to this objection, supplemental affidavits were filed February 4 and February 7, 1963, accompanied by typewritten copies of exhibits I and II.

The supplemental affidavits contain the following averments:

Deponent [Blake] further states that the products of Exhibits I and II were evaluated prior to June 26, 1958, under his and/or Dr. William C. Hammann's direction and/or supervision for thermal decomposition points * * * and for viscosity in centistokes (cs) at several temperatures, with the following results:

Exhibit I—The bis(m-phenoxyphenyl) ether * * * sample was found to be a light-yellow colored liquid having a refractive index ($n_D^{25}$) of 1.-6194, a thermal decomposition point above 700°F and a viscosity respectively at 100°, 210°, 400° and 700°F of 67.708, 6.29, 1.37, and 0.473 centistokes. The sample was observed to still be a liquid after storage for more than one (1) year.

Exhibit II—The m-bis(m-phenoxyphenoxy) benzene * * * sample was found to be a colorless liquid having a refractive index ($n_D^{25}$) of 1.6300, a thermal decomposition point of 792° F and a viscosity respectively at 100, 210 and 400° F of 343.62, 12.948 and 2.087 centistokes.

The examiner held that the foregoing affidavits were insufficient to overcome Diamond for the following reasons:

(1) The affidavits and exhibits are limited to 2 species, however, as previously noted the Diamond reference discloses a range of polyphenyl ethers and the instant claims are directed to more than 2 species.

(2) The said affidavits do not cover the mixtures of polyphenyl ethers as disclosed in Diamond and instantly claimed.

(3) The affidavits do not contain an adequate showing of utility of the compounds. It is not evident how the mere disclosure of properties for the two species disclosed in the affidavits establishes utility as functional fluids. It is clear from Wilkinson et al., 1962 C.D. 689 that an adequate showing of utility is necessary in an affidavit under Rule 131 and particularly when, as in the instant case, the reference discloses utility for the compounds.

The board made the following holdings with regard to the three reasons advanced by the examiner:

The first point raised by the Examiner is clearly not applicable to claims 3 and 4 which are drawn to the species disclosed in the affidavits and accompanying exhibits. We are further of the opinion that in the instant case the two species prepared by appellants are sufficiently representative of the generic class of compounds claimed to warrant claiming the class.

Therefore we will not sustain point 1.

We will sustain the second point raised by the Examiner. This criticism of the affidavits applies only to those claims drawn to mixtures, namely claims 10, 12, 13, 15, 16 and 17. We deem the limitation to a mixture to be a pertinent limitation disclosed in Diamond. Therefore, the affidavits are insufficient to remove Diamond in that they do not disclose this limitation. * * *

An establishment of utility requires testing the compounds in the specific use for which they are designed or laboratory tests may be made which must simulate actual service conditions with sufficient clearness to render it reasonably certain that the subject matter will perform its intended function in actual service. We do not consider that merely determining the thermal decomposition points and viscosity at certain temperatures of two of the compounds claimed constitutes such tests as to warrant the conclusion that there has been a reduction to practice of the subject matter claimed for the purposes in view. * * * We further fail to find in the affida-

vits submitted any factual evidence to show that the thermal decomposition points and viscosities mentioned were actually determined prior to the filing date of the Diamond patent. * * *

Subsequent to the board's decision, and coincident with the filing of a petition for rehearing, appellants filed supplemental affidavits apparently in response to the board's statement that factual evidence was lacking that the data in the earlier filed affidavits was obtained prior to Diamond's filing date.

In disposing of the petition, the board adhered to its original decision without commenting on the newly filed affidavits.

■ The solicitor urges this court not to consider the affidavits filed subsequent to the board's decision. Under the facts of this case, we are unable to agree with the solicitor. The affidavits filed subsequent to the board's decision did not contain any additional material averments or factual evidence. Rather, the affidavits consisted of original compilation sheets on which was written the data recited in the earlier affidavits. Thus, the board was not faced with the task of considering evidence which had not been considered by the examiner and by the board itself in its original decision. Moreover, at no time did the examiner criticize the affidavits for their lack of showing that the data was not obtained prior to Diamond's filing date. This matter was raised for the first time by the board. Additionally, the earlier filed affidavits contained averments that the data set forth therein was obtained prior to Diamond's filing date.

As to the merits of the utility requirement in the affidavits, it was the board's view that testing of the claimed compounds, either in the specific environment for which they were designed or under laboratory conditions sufficiently simulating such environment, was necessary to establish utility and that determining thermal decomposition points and viscosity at certain temperatures did not suffice.

Appellants agree with the board to the extent that a showing of utility is necessary when, as here, the reference discloses a utility for the subject matter being used to reject the claims. It is appellants' position, however, that the information known to the inventors concerning the claimed compounds was sufficient to make their utility obvious to themselves and others having ordinary skill in the functional fluid art.

■ This court has made it clear that whether or not testing of an invention is required to establish utility, and if so, the nature and extent of such testing, depends on the facts of the particular case. No a priori rules can be formulated to meet the exigencies of each case. Thus, we reject the solicitor's contention that testing, presumably in or closely simulating the intended environment, is an *absolute* requirement when the inventor's aim is to produce a new product superior to a then-existing product.

■ The evidence necessary to prove a particular utility depends, inter alia, on the nature of the invention sought to be patented. In this case, the utility sought to be proved is that the claimed compounds are suitable as high-temperature functional fluids. This utility, though not specified in the claims, is mentioned in appellants' specification and was contemplated by applicants at the time of their alleged reduction to practice prior to the filing date of Diamond. Thus, the ultimate issue in this case is whether or not the evidence is such that one of ordinary skill in the art would be satisfied to a reasonable certainty that the subject matter necessary to antedate the reference possessed the alleged utility. Stated in this manner, testing is not an arbitrary requirement but is merely one form of evidence relevant to the issue of proof of utility. If testing of the kind insisted on here is found to be a requirement in a particular case, it is because one of ordinary skill in the art would not otherwise be satisfied to a reasonable certainty that the subject matter in question possessed the requisite utility.

As we stated above, the utility which appellants must establish is that their claimed compounds are suitable as high-temperature functional fluids. With regard to such utility, appellants' specification states:

The present critical requirements for high-temperature functional fluids are extremely restrictive. Thus, the functional fluid may be required as a synthetic lubricant for jet engines, as a hydraulic fluid for supersonic aircraft and missiles, as coolants for electronic equipment, etc., wherein the fluid is often required to function at extreme temperature ranges up to 800° F. and higher and down to normal atmospheric temperatures. These requirements pose the very difficult problem of finding suitable compositions which are thermally stable at the very high temperatures, but are still fluid at the lower temperatures. The fluids must also possess adequate temperature-viscosity properties and suitable lubricity, i. e., the fluids must not get too thin at the very high temperatures and/or too thick at the lower temperatures, and must possess adequate lubricating characteristics over the range of temperatures to which the system is subjected.

In addition to the characteristics for functional fluids set forth in the foregoing portion of appellants' specification, it is also stated that functional fluids must be "substantially free from corrosive action." With these characteristics in mind, we now turn to an analysis of the evidence of record bearing on the issue of utility.

First to consider is the requirement that the composition be liquid at low temperatures. This requirement appears met by the fact that the compounds bis (m-phenoxyphenyl) ether and m-bis (phenoxyphenoxy) benzene were observed to be colorless oils at room temperature as is demonstrated by the fact that their refractive indices could be and were measured at 25° C. ($n_D^{25}$) of 1.6194 and 1.6300, respectively. As to the latter compound, further evidence on this point

is supplied by the fact that its pour point was determined to be about 50° F.

The second requirement concerns the thermal stability of the composition at elevated temperatures. We believe this requirement is met by the fact that the thermal decomposition points for bis(m-phenoxylphenyl) ether and m-bis(m-phenoxyphenoxy) benzene were measured and determined to be above 700° F. for the former and 792° F. for the latter.

The third requirement is that the composition must have adequate temperature-viscosity and lubricity properties. We think this requirement is also met as to both compounds in question. As to bis(m-phenoxyphenyl) ether, the viscosity at 100° F., 210° F., 400° F. and 700° F. was measured and determined to be, respectively, 67.708, 6.29, 1.37, and 0.473 centistokes. As to m-bis(m-phenoxyphenoxy) benzene, the viscosity at 100° F., 210° F., and 400° F. was measured and determined to be, respectively, 343.62, 12.948, and 2.087 centistokes. The Patent Office has not challenged the adequacy of this data to establish the requisite lubricity and viscosity-temperature properties for high-temperature functional fluids, and we perceive no reason to do so.

The fourth requirement is that the composition must be noncorrosive. While the Rule 131 affidavits are silent as to this specific property, there is of record several pages of the text Kirk and Othmer, Encyclopedia of Chemical Technology (1957). Pages 392 and 557–569 of this text were presented to the board and the solicitor has expressly indicated no objection to their consideration in this appeal. On page 392, there appears the following:

Dowtherm A (see Diphenyl; Phenolic ethers) is a trade-marked name for a eutectic mixture of 73.5% diphenyl ether (diphenyl oxide) and 26.5% diphenyl (biphenyl). The mixture solidifies at 54° F.; the recommended working range is 450–725° F. Since decomposition at higher temperature levels is by thermal cracking, the rate

of decomposition is dependent on temperature; the equipment should therefore be properly designed so that excessive film temperatures will not be encountered.

Dowtherm A is noncorrosive, and therefore equipment for its use may be fabricated of carbon steel. * * *

With regard to this passage from the Encyclopedia, appellants' state:

Appellants also submit that lower polyphenyl ethers which are outside the scope of their invention and claims, e. g. wherein n in Appellants' generic formula * * * would be 1, have long been known to those skilled in the art as the principal component of the heat-transfer fluid sold under the trademark "Dowtherm" A. This commercial functional fluid product is a eutectic mixture of approximately 75% diphenyl ether and 25% of biphenyl, is a noncorrosive fluid solidifying at about 54° F and is employed over a working range of from about 450° to 725° F, i. e. the chemical structure of the benzenoid rings joined through an ether linkage was known to have a high degree of thermal stability and to be relatively chemically inert prior to Appellants' invention. * * *

We see no reason to doubt appellants' assertions on this point; certainly the Patent Office has not provided us with any reason. Appellants' compositions do not contain any different functional groups from those present in "Dowtherm" A. This closeness in structure is, in our view, persuasive that one of ordinary skill in the art would be satisfied to a reasonable certainty that the claimed compositions were noncorrosive.

█ From the foregoing, we think it clear that sufficient evidence was presented to satisfy one of ordinary skill in the art to a reasonable certainty that the subject matter necessary to antedate the Diamond reference (here the compositions of claims 3 and 4) possessed the alleged utility.

There remains for consideration the board's decision affirming the rejection of claims drawn to mixtures of polyphenyl ethers. Initially, there is a dispute as to whether the board's decision applied to appealed claims 1 and 12 or merely to claim 12. This dispute arises because the board failed to mention claim 1 in passing on the issue regarding mixtures. However, the examiner's answer clearly stated that this aspect of the rejection applied, inter alia, to claims 1 and 12.

With regard to mixtures, Diamond states:

The unsubstituted polyphenyl ethers have been found to be outstandingly stable but may be improved in their operating life at temparatures above 400° F. by the presence of the subject classes of additives as described herein. However, the major use of the present invention is with respect to the two other types of polyphenyl ethers, namely, those containing tertiary butyl substituents, alpha-cumyl substituents or both. Mixtures of the unsubstituted polyphenyl ethers with the tertiary butyl or alpha-cumyl substituted ethers is contemplated.

As to the purpose for utilizing mixtures of substituted and unsubstituted polyethers, Diamond states:

When utilizing mixtures of unsubstituted polyphenyl ethers with the tertiary butyl or alpha-cumyl substituted polyphenyl ethers, it is preferred that the composition contain from 10 to 90% of unsubstituted ethers containing 2–6 phenyl radicals per molecule together with 90–10% by weight based on the total composition of the substituted polyphenyl ethers as defined above. The principal function of the unsubstituted polyphenyl ethers is to enhance the outstanding high-temperature stability which this class of compounds has been found to exhibit. The substituted polyphenyl ethers as outlined above impart low melting points and in mixture with the unsubstituted polyphenyl ethers causes the melting point of the entire composition to be substantially lower than

that of the unsubstituted polyphenyl ethers themselves.

 The above-quoted passages from Diamond amply support appellants' contention that "* * * Diamond does not disclose mixtures restricted to the unsubstituted all-meta linked polyphenyl ethers," as called for by appealed claims 1 and 12. Thus, it was unnecessary for appellants to show mixtures of their claimed polyethers in a Rule 131 affidavit. In re Stempel, 241 F.2d 755, 44 CCPA 820.

The board's decision is reversed.

Reversed.